THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROY MAYNOR, | § | |
| | § | |
| Plaintiff, | § | C.A. 3:07-cv-00504 |
| | § | (JURY) |
| v. | § | |
| | § | |
| THE DOW CHEMICAL COMPANY | § | COLLECTIVE ACTION |
| | § | |
| Defendant. | § | |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE LEE H. ROSENTHAL:

Plaintiffs file this Motion for Summary Judgment and would show the Court as follows:

### I. NATURE AND STAGE OF PROCEEDING

1. This collective action under the Fair Labor Standards Act, 29 U.S.C. Section 216(b)(2009)("FLSA") arises from The Dow Chemical Company's failure to pay its operators in Freeport, Texas, for their time spent in a mandatory training program. The Court certified a conditional class of current and former operators who were required to undergo training and testing as part of Dow's Site Foundational Skills Program (the "Training Program") between October 9, 2004 and November 30, 2006. Since then, one hundred twenty-nine (129) operators have joined the original Plaintiff, Roy Maynor, in this lawsuit. Discovery is closed and docket call is scheduled for October 30, 2009.

### II. STATEMENT OF THE ISSUES

2. Here, the Plaintiffs seek a judicial finding that their

hours of participation in the Training Program should be counted as hours worked because the Training Program does not meet all of the criteria necessary to exclude these hours from working time. See 29 C.F.R Section 785.27 (2009). Specifically, the training was directly related to the Plaintiffs' jobs and their participation in the Training Program was not voluntary. See 29 C.F.R Sections 785.28 and 785.29 (2009). Additionally, the Plaintiffs ask the Court to find as a matter of law that their acceptance of partial payments from Dow following an investigation of the Training Program by the Department of Labor ("DOL") did not waive their claims for the remaining unpaid wages and overtime compensation. The facts related to these issues are not in dispute and the Court's rulings would significantly narrow the issues remaining for trial.

### III. FACTUAL BACKGROUND

3. According to its website, Dow manufactures chemicals for sale to a number of industries worldwide. The Dow facility in Freeport, Texas manufactures over forty percent (40%) of all Dow products sold within the United States.

4. During the time period relevant to this collective action, over nine hundred (900) members of Local Union No. 564 of the International Union of Operating Engineers (the "Union") were employed by Dow as hourly non-exempt operators in Freeport, Texas. See Exhibit "A," Declaration of Charlie Singletary, Business

-2-

Manager and Custodian of Records for the Union and Attachment "A-1"
Deposition On Written Questions of Charlie Singletary; Exhibit "B,"
Deposition of Robin Campbell, p. 146-147.  These operators worked
at Dow subject to the terms and conditions of a collective
bargaining agreement negotiated between the Union and Dow that
became effective on May 14, 2003.  See Exhibit "C," Collective
Bargaining Agreement between The Dow Chemical Company and the Union
(the "CBA").

5.  Article XXXIV of the CBA entitled "Skills Initiative"
established the Site Foundational Skills Program, a mandatory
training program required for all operators hired by Dow before May
14, 2003.  See Exhibit "C."  The express intent of the required
Training Program was "to upgrade and maintain skills to increase
competitiveness of operators" and "to insure that all operators are
given the opportunities and assistance in achieving the desired
skill levels."  See Exhibit "C."  More specifically, Dow decided to
raise the educational requirements for its operators in response to
rapid changes in technology.  See Exhibit "B," p. 40.

6.  First, Dow established the requirement of an associate's
degree as a condition of employment for prospectively hired
operators.  See Exhibit "B," p. 40.  Second, Dow implemented the
Training Program to raise the skill level of its existing operator
workforce and help Dow's long time operators fulfill their current
job expectations.  See Exhibit "B," p. 41.

-3-

7.    The Training Program consisted of six (6) content areas including: reading, applied mathematics, locating information, teamwork, applied technology, and observation. <u>See</u> Exhibit "C." Each content area, or skill category, was comprised of five (5) to seven (7) skill levels. <u>See</u> Exhibit "C." Once each operator's skill level was determined through mandatory testing, the operators were then expected to advance two (2) skill levels per year until each operator achieved the skill level required by Dow in every category. <u>See</u> Exhibit "C" and Exhibit "D," Affidavit of Robin Campbell, para 12.

8.    Dow contracted with Brazosport College's Center for Business/Industry Training (the "College") and the testing firm ACT to implement and administer the Training Program. <u>See</u> Exhibit "D," para 12. As a result, the operators were provided with various training options, including 1) on-line training programs; 2) classes covering content specific to the skill categories; 3) computer labs staffed with instructors; 4) one-on-one tutoring; and 5) CDs and printed materials for self study. <u>See</u> Exhibit "D," para 14.    The operators were also provided workbooks to use as additional study tools, the cover pages of the various workbooks are attached hereto.    <u>See</u> Exhibit "E," Deposition on Written Questions of Custodian of Records for Brazosport College.

9.    The operators were given until December 31, 2004 to advance the requisite skill levels for the first year. <u>See</u> Exhibit "D," p. 16.  Additionally, the operators were required to execute

releases so that their participation and progress in the Training Program could be monitored by Dow.[1]  <u>See</u> Exhibit "D," para 12.

10.   The compensability of the operators' time spent in the Training Program was discussed during the negotiation of the CBA. <u>See</u> Exhibit "A" and Exhibit "B," p. 28.  Dow's position, both then and now, was that while the operators were required to advance two (2) skill levels in the program each year, they were not required to train.  <u>See</u> Exhibit "B," p. 30.  Rather, Dow maintains that the training options were simply made available to operators who thought it might be helpful.  <u>See</u> Exhibit "B," p. 29.  Thus, Dow steadfastly refused to pay operators for their time spent training in order to advance the required two (2) skills levels.   <u>See</u> Exhibit "B," p. 30.

11.   The failure of an operator to comply with the requirements of the Training Program could and did result in corrective disciplinary action.  <u>See</u> Exhibit "A" and Exhibit "C." Beginning in January of 2005, operators received disciplinary warnings, both verbal and written, from their supervisors at Dow for their failure to comply with the Training Program.  <u>See</u> Exhibit "A" and Attachment "A-1," p. 61-117.  At least four (4) operators were suspended in connection with the Training Program resulting in the loss of their performance award for 2005.  <u>See</u> Exhibit "A," p.

---

1 Dow received an excel spreadsheet from the College every month identifying the skill levels assessed and/or advanced by the operators as well as the number of hours spent by the operators in class or online. <u>See</u> Exhibit "B," p. 68-70.

23.  Plaintiff Roy Maynor's employment with Dow was terminated for noncompliance in connection with the involuntary Training Program. See Exhibit "B," p. 115.

12.  In February of 2005, Dow and the Union entered into an agreement establishing guidelines for disciplinary actions to be taken in the event of an operator's noncompliance with the Training Program.  See Exhibit "D," para 18 and its attachment "B-1."  The agreement identified specific situations or "scenarios" deemed noncompliant and the corresponding disciplinary action that would be taken by Dow in response to those circumstances.  See Exhibit "D," para 18 and its attachment "B-1."

13.  The scenarios and applicable disciplinary actions were divided into three (3) tiers.  See Exhibit "D," para 18 and its attachment "B-1."  Tier I provided for written warnings if an employee: 1) did not sign the college release form; 2) did not take an initial assessment to determine their existing skill level; or, 3) failed to demonstrate activity in the Training Program other than the initial assessment.  See Exhibit "D," para 18 and its attachment  "B-1."

14.  A Tier II violation occurred when an employee with less less than forty (40) hours of accumulated training time failed to advance two (2) skill levels.   Under these circumstances, the employee would receive a step in the progressive discipline plan up to and including a suspension without pay.  See Exhibit "D," para

18 and its attachment "B-1." A Tier III violation occurred when an employee with more than forty (40) hours of training time failed to advance two (2) skill levels. See Exhibit "D," para 18 and its attachment "B-1." A Tier III violation would result in the issuance of a letter of expectations stating the deadline by which the employee must complete the past year's requirements and the actions that would be taken if the deadline was not met. See Exhibit "D," para 18 and its attachment "B-1."

15. By September of 2006, over forty (40) operators had been disciplined by Dow in connection with the Training Program. See Exhibit "A," p. 19-117. At that point, the Union filed a complaint with the DOL stating that Dow's failure to compensate its members for the time spent in the mandatory Training Program was a violation of the FLSA. See Exhibit "A" and Attachment "A-1," p. 19-117.

16. Almost immediately, in November of 2006, Dow eliminated the two (2) skill level requirement. See Exhibit "D," para. 23. Dow also removed the threat of disciplinary action in connection with the Training Program. See Exhibit "D," para. 23. Going forward, the only penalty associated with the failure to complete the Training Program was the inability to bid into a new job. See Exhibit "D," para. 23.

17. At the conclusion of its investigation, the DOL found that Dow's failure to pay the operators for time spent in the

mandatory Training Program was a violation of the FLSA.   <u>See</u>
Exhibit "F," Declaration of Patricia Haylon and Attachment "F-1."
A spreadsheet reflecting the number of training hours completed by
each operator as recorded by the college was provided to the DOL by
Dow.   <u>See</u> Exhibit "B," p. 130.   The calculation of unpaid back
wages based on the spreadsheet totaled approximately $2.67 million
dollars.   <u>See</u> Exhibit "B," p. 130.

18.   Dow disagreed with the DOL's conclusions and findings.
<u>See</u> Exhibit "B," p. 131.   Nevertheless, Dow agreed to pay the
operators $683,823.04 for their participation in the mandatory
Training Program.   <u>See</u> Attachment "F-1" to Exhibit "F."   However,
the DOL advised Dow that it considered the payment unreasonable and
that it would not be viewed as a supervised settlement.   <u>See</u>
Attachment "F-1" to Exhibit "F."   As such, Dow understood that the
payment would not prevent future lawsuits by operators.   <u>See</u>
Exhibit "B," p. 139-140.

19.   Dow advised the operators of the payment by letter
stating in relevant part:

You will be receiving a payment from the Dow Chemical
Company ("Dow") and we want to inform you of the purpose
of the payment and give you some background on how the
payment came to be made.

The U.S. Department of Labor ("DOL") recently completed
a review of how Dow administered certain skills
initiative training in the past.   As a result of this
review, Dow and the DOL have reached an agreement
addressing the question of compensability of time that
some employees spent on this training.

-8-

The skills initiative practice which was in question had been negotiated and agreed to by the Union and the Company in 2003. However, the DOL took the position that some of the employees' time in the training program was compensable under federal law. After numerous discussions, Dow has voluntarily reached an agreement with the DOL on this issue. While our company does not necessarily agree with the position taken by the DOL, we felt that it was in the best interests of all parties involved to reach an agreement as quickly as possible, in order to bring this matter to resolution.

See Exhibit "A" and Attachment "A-1," p. 3.

20. Finally, and in response to the Union's inquiries, the DOL investigator informed the Union that the operators would not waive their rights to pursue future claims by accepting Dow's partial payment. See Exhibit "A" and Attachment "A-1," p. 137. Accordingly, this collective action followed.

## IV. SUMMARY JUDGMENT STANDARD

21. Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the pleadings, discovery products, and affidavits on file show that there are no genuine issues of material fact and that the moving party is entitled to summary judgment as a matter of law. Celotex Corp. V. Catrett, 477 U.S. 317, 326 (1986). The question of whether a particular set of facts and circumstances constitutes work under the FLSA is a question of law. Birdwell v. City of Gadsden, Ala., 970 F. 2d 802, 807 (11th Cir. 1992).

22. Applied here, there are no material facts in dispute that would preclude a finding by the Court that the Training Program was

mandatory such that the time spent in the program should be counted as hours worked.  Additionally, the undisputed evidence regarding the partial payment of back wages owed by Dow to the operators reveals that no waiver of claims occurred as a matter of law.

### V.  ARGUMENT AND AUTHORITIES

#### A.  The Operators' Time Spent In The Training Program Was Compensable

23.  The FLSA requires an employer to pay its employees for all hours worked.  29 U.S.C. Section 206 (2009).  An employer who is armed with knowledge that an employee is working overtime cannot stand idly by and allow an employee to perform work without compensation.  Newton v. City of Henderson, 47 F. 3d 746, 748 (5th Cir. 1995).

24.  Not surprisingly, this rule applies whether the work is performed on or off the job site and includes time spent in job related training activities.  29 C.F.R. Section 785.27 (2009); Moreau v. Klevenhagen, 956 F. 2d 516, 521 (5th Cir. 1992).  Specifically, attendance at lectures, meetings, training programs and similar activities must be compensated as hours worked unless all of the following criteria are met:

a)  Attendance is outside of the employee's regular working hours;

b)  Attendance is in fact voluntary;

c)  The course, lecture, or meeting is not directly related to the employee's job; and

d)   The employee does not perform any productive work during such attendance.

29 C.F.R. Section 785.27 (2009); <u>Farmer v. Ottawa County</u>, No. 98-2321/No. 99-1047, 2000 U.S. App. LEXIS 7224 at 6 (6th Cir. April 13, 2000). Applied here, the Training Program did not meet all of the criteria required to avoid compensation for time spent in the Training Program. First, the Training Program was directly related to the operators' work. Second, the operators' participation in the Training Program was not voluntary. As a result, the operators' time spent in the Training Program should be counted as hours worked.

## 1. The Training Program Was Directly Related To The Operators' Jobs

25.   Time spent in training that is directly related to an employee's job is compensable as hours worked. 29 C.F.R. Section 785.27 (2009). Training is directly related to an employee's job when it is designed to make an employee handle his job more effectively as distinguished from training for another job. 29 C.F.R. Section 785.27 (2009); <u>Haszard v. American Medical Response Northwest, Inc.</u>, 237 F. Supp. 2d 1151, 1160 (D. Or. 2001); 29 C.F.R. Section 785.29(2009); Wage and Hour Opinion Letter of September 27, 1984. In this case, it is undisputed that the Training Program was designed to make the operators' better able to perform their jobs.

26.   According to Dow, the original intent of the Training Program was to raise the skill level of its incumbent workforce.

See Exhibit "B," p. 40. In fact, Dow concedes that the rationale underlying the Training Program was to help the operators fulfill their job expectations. See Exhibit "B," p. 41. Dow's stated objective was expressed to the Union during the negotiations and in the CBA itself. See Exhibit "A."

27. The CBA states that it is the intent of the training program to upgrade and maintain the operators' skills. See Exhibit "C." As such, the operators were required to train and test in order to retain their current employment. See Exhibit "C."

28. Finally, Dow's expressed intent that the training was designed to enhance the skills of its incumbent workforce was borne out in actual practice. For example, in September of 2006 when the Union filed its complaint with the DOL, all of the operators who had completed the Training Program remained in their operator jobs. See Exhibit "A." None of the operators had been promoted. See Exhibit "A." Clearly then, the training was not preparation for a different job.

29. In sum, the summary judgment evidence clearly establishes that the Training Program was directly related to the operators jobs. The failure to meet this criteria, standing alone, is sufficient to characterize the operators' training time as hours worked. As such, the time spent by the operators in the Training Program is compensable as a matter of law.

2. <u>Time Spent In The Training Program Was Not Voluntary</u>

30.  In addition, the Training Program failed to meet another criteria that is necessary to avoid compensation.  Specifically, when training is required by an employer, it is not voluntary and thus, counts as compensable time.  29 C.F.R. Section 785.28 (2009); 29 C.F.R. Section 785.27 (2009); <u>Haszard</u>, 237 F. Supp. 2d at 1153. Training is required when the employee is given to understand, or led to believe, that his or her working conditions, or the continuance of employment, would be adversely affected by nonattendance.  29 C.F.R. Section 785.28 (2009); <u>Haszard</u>, 237 F. Supp. 2d at 1153.  That is precisely the situation created by Dow and expressed in the CBA.

31.  First, the CBA states that operators "will be expected to move up at least 2 Skill Levels per year until the employee has achieved the required Skill Level in all the Skill Categories." <u>See</u> Exhibit "C."  The CBA also mandates to the operators that "failure of the employee to attempt to reach these requirements could result in corrective disciplinary action." <u>See</u> Exhibit "C."  At a minimum, the express language of the CBA led operators to believe that their working conditions would be adversely affected by their failure to participate in the Training Program.  More likely as the summary judgment evidence demonstrates, the operators' employment was, in fact, adversely affected.

32.  Second, Dow ensured that the various training options were

-13-

available to the operators.  See Exhibit "D," para 14.   Dow contracted with the College and paid for the training provided to the operators.  See Exhibit "B, p. 52.  Dow then monitored the amount of time spent by the operators in training on a monthly basis.  See Exhibit "B," p. 72.

33.  Finally, Dow subjected at least forty (40) operators to disciplinary action for failure to meet their "annual requirement." See Exhibit "A" and Attachment "A-1," p. 19-117.  See also Exhibit "G," Deposition of Kenneth Nugent, p. 58.  Operators received verbal warnings, written warnings and suspensions in connection with the training program.  See Exhibit "A" and Attachment "A-1," p. 19-117. Maynor was terminated for noncompliance with the training program. See Exhibit "B," p. 115.    In short, the operators' working conditions were, in fact, adversely affected by their lack of participation in the Training Program.

34. Nevertheless, Dow insists that it never required training as part of the Training Program.  See Exhibit "B," p. 45.  According to Dow, the company only required the operators to advance two (2) skill levels annually.  See Exhibit "B," p. 48.  In other words, Dow denies liability for the hours spent by the operators preparing for the tests that they were required to pass.  However, the notion that an employer can avoid compensating its employees for their training hours under these circumstances has already been rejected.

35.  More specifically, all time spent training to achieve a

-14-

mandatory condition of employment must be counted as hours worked. See Wage and Hour Opinion Letter, WH-74, dated September 9, 1970 attached hereto (practice time spent becoming proficient at skills required to retain employment is not voluntary).

36.  In a strikingly similar situation, the DOL concluded that training activities performed to achieve a mandatory condition of employment were not voluntary.  See Wage and Hour Opinion Letter, dated September 27, 1984 attached hereto.  Specifically, a hospital desiring to upgrade and maintain its quality of nursing care planned to implement an objective system to measure the competency of its nurses.  A nurse's continued employment would be dependent upon a demonstrated improvement of any identified deficiencies. A variety of resources would be made available to assist the nurses improve their performance on a voluntary basis.  However, a nurse needed to do nothing if advised of an existing deficiency.  The DOL found that participation in the suggested training activities was not voluntary and must be counted as hours worked.  "Since a nurse's continued employment may be in jeopardy, participation in the training activities is not voluntary."  In other words, the DOL rejected the same artificial distinction argued by Dow between a result required as a condition of continued employment and the training done to achieve that result.  See Wage and Hour Opinion Letter, dated September 27, 1984.  As more aptly stated by Plaintiff Clifton Butler, "How would you advance if you didn't study for a test?"  See

-15-

Exhibit "H," Deposition of Clifton Butler, p. 48.

37. Alternatively, Dow argues that a maximum of forty (40) hours per year of training time was compensable because employees who completed forty (40) hours of training without advancing two (2) skill levels fell under the "Tier III" guidelines which was not considered discipline by Dow. See Exhibit "B," p. 130. However, the facts and the law do not support Dow's position.

38. As a preliminary matter, the actions taken by Dow in response to a Tier III scenario were not inconsequential as suggested by Dow. Employees who completed forty (40) hours of training time but failed to advance two (2) skill levels were given a letter of expectation. See Exhibit "D," para 18 and its attachment "B-1." All letters of expectation stated that disciplinary action may result if the expectations were not met. See Exhibit "A" and Attachment "A-1," p. 68, 69, 71, 73, 86, 102, and 111.

39. Further, some letters of expectations included an action plan which expressly required additional training. The action plans stated that any problems with the completion of the expectations "will prompt a meeting with my supervisor." See Exhibit "A" and Attachment "A-1," p. 68-69. Contrary to Dow's assertions, these circumstances tended to naturally result in the employee's reasonable belief that their working conditions would be adversely affected by a failure to meet expectations. See 29 C.F.R. Section

-16-

785.28 (2009).

40.    In any event, the presence or absence of adverse consequences related to the number of training hours completed is irrelevant to the issue of compensability.  In the above example, the DOL analyzed the compensability of the nurses' training activities with respect to the consequences associated with the competency test itself.  See Wage and Hour Opinion Letter, dated September 27, 1984.    There, as here, the nurses' continued employment was dependent upon a mandatory result unrelated to the number of hours spent in training.  Yet, the DOL found that all of the training done to achieve this mandatory objective was compensable. As such, Dow's argument that disciplinary action must be directly related to the training itself is without merit. Accordingly, all hours spent in training to qualify for a mandatory objective are not voluntary, but rather, are compensable as hours worked.

41.    Moreover, the allotment of a "reasonable time" for training by an employer has been specifically rejected as "devoid of merit."  Donovan v. United States Postal Service, No. 78-602; 1981 U.S. Dist. LEXIS 17145 (D.D.C. October 23, 1981).    In that case, the postal service paid employees for five (5) hours of study time in connection with mandatory testing.    The postal service selected this number based on a statistical analysis of time spent by all employees studying for the required examination.    The Court

-17-

held that employees must be paid for the actual work suffered or permitted by their employer. <u>United States Postal Service</u>, U.S. Dist. LEXIS 17145 at 14.    The Court went on to state that an employer may not unilaterally decide how much time is reasonably spent by an employee at a given task while permitting the employee to continue at that activity. <u>United States Postal Service</u>, U.S. Dist. LEXIS 17145 at 14.   Applied here, Dow cannot unilaterally limit the compensation owed to operators for their actual training time in accordance with a number deemed reasonable by Dow.

42.   In sum, Dow required its operators to advance two (2) skill levels per year through testing.   The training time spent by the operators to achieve this mandatory objective was not voluntary. Such time was compensable whether or not disciplinary action was related to the number of hours spent in the program.    Finally, an employer cannot refuse compensation for actual work done in favor of an arbitrary limit.    As such, all actual time spent by the operators in the Training Program was compensable. <u>See</u> also Wage and Hour Opinion Letter, WH-74, dated September 9, 1970.

B. <u>The Operators' Have Not Waived Their Claims</u>

43.   This Court previously found that based on the record at the time this conditional class was certified, it did not appear that the operators waived their right to assert claims against Dow by accepting payments from Dow. <u>See</u> Memorandum And Order dated May 28, 2008.    Now, at the close of discovery, there is no evidence

-18-

which would alter the Court's finding. In fact, discovery has confirmed the Court's initial finding. Thus, Plaintiffs seek a judicial finding that the Plaintiffs have not waived their claims against Dow as a matter of law.

44. As discussed more fully in Plaintiff's Motion for Conditional Certification, Dow reluctantly made partial payments to operators following the DOL's investigation. See Exhibit "B," p. 134. However, Dow's payments did not meet the criteria for effective waiver.

45. For such a waiver to be valid, the employee must agree to accept the payment which the Secretary determines to be due and there must be payment in full. Sneed v. Sneed's Shipbuilding, Inc., 545 F. 2d 537 (5th Cir. 1977). Typically, an employee manifests assent by signing a receipt such as the standard Form WH-58 which puts the employee on notice of the resulting waiver. Dent v. Cox Communications Las Vegas, Inc., 502 F. 3d 1141, 1147 (9th Cir. 2007). In Walton v. United Consumers Club, 786 F. 2d 303 (7th Cir. 1986), the Court explained how to determine when a waiver has occurred:

> The Department apparently distinguishes among settlements. When it thinks that it has achieved "enough" for the employees – something close to full payment of the wages and overtime due – it sends them agreements explicitly releasing the right to sue, and it requests them to sign these forms if they wish to take the money. When the Department thinks that it has fallen far short, it does not solicit these signatures. The Department's decision is the kind of supervision that Section 16(c) contemplates. The idea is that federal

supervision replaces private bargaining and that the
right to receive full statutory wages and overtime is not
to be extinguished without the assent of both employee
and Secretary.  If the Secretary withholds assent, he
declines to send out the form soliciting agreement. ...

Walton, 786 F. 2d at 306-307.  The Court went on to hold that

because the DOL did not send out the form agreements (Form WH-58)

or ask the employees to surrender any rights, the employees' cashing

of checks did not release their full claims.  Walton, 786 F. 2d at

306-307; Dent, 502 F. 3d at 1144.  Applied here, the DOL informed

Dow that Form WH-58 would not be used and the employees would not

be waiving their right to pursue claims in the future.   See

Attachment "F-1" to Exhibit "F."

     46.  Specifically in this case, the DOL offered Dow two (2)

options to resolve the complaint.  See Attachment "F-1" to Exhibit

"F."  Option 1 required Dow to pay back wages for a three (3) year

period.  If Dow accepted Option 1, the DOL would use Form WH-58 as

proof of payment.  See Attachment "F-1" to Exhibit "F."  Option 2

allowed Dow to conduct a self audit and pay back wages for a two (2)

year period.  Under Option 2, Form WH-58 would not be used.  Dow

selected Option 2.  See Attachment "F-1" to Exhibit "F."  Thus, Dow

understood at the time that the payment was made that such payment

would not prevent future lawsuits by operators.  See Exhibit "B,"

p. 139-140.

     47.  Accordingly, neither Dow nor the DOL told the operators

that their claims could be waived by acceptance of the payment.  In

fact, the DOL investigator advised the Union that operators did not waive their rights to pursue claims by accepting the payment. <u>See</u> Exhibit "A" and Attachment "A-1," p. 137. This type of representation was expressly held to negate the argument that plaintiffs meant to settle their claim by cashing their checks. <u>Walton</u>, 786 F. 2d at 307.

48. In sum, the facts revealed in discovery undermine all assertions of waiver in this case. Therefore, Plaintiffs request that the Court find that the Plaintiffs have not waived their right to pursue their claims as a matter of law.

## VI. CONCLUSION

49. In sum, the time spent by the operators in the Training Program was not voluntary and was directly related to their jobs. As such, the time is compensable and should be counted as hours worked. Additionally, the DOL did not supervise the partial payments made to the operators and their acceptance of these payments did not evidence an agreement to settle their claims. Therefore, the Plaintiffs respectfully request that the Court find that the hours spent by the Plaintiffs in the Training Program are compensable as hours worked. Further, the Plaintiffs ask the Court to find that the Plaintiffs' acceptance of the partial payments made by Dow did not result in a waiver of claims as a matter of law.

Respectfully submitted,


Mark Siurek
TBA# 18447900
Fed ID# 9417
3355 W. Alabama, Suite 1010
Houston, Texas  77098
713-522-0066 (telephone)
713-522-9977 (fax)

ATTORNEY-IN-CHARGE FOR PLAINTIFFS


OF COUNSEL:

WARREN & SIUREK, L.L.P.
Patricia Haylon
TBA# 09281925
Fed ID #13941
3355 W. Alabama, Suite 1010
Houston, Texas 77098
713-522-0066 (telephone)
713-522-9977 (fax)

LAW OFFICE OF DOUGLAS B. WELMAKER
Douglas B. Welmaker
TBA# 00788641
Fed ID# 17038
3355 W. Alabama, Suite 1010
Houston, Texas 77098
713-522-0066 (telephone)
713-522-9977 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Plaintiffs' Motion for Partial Summary Judgment was served on opposing counsel by fax and/or email on July 31, 2009, properly addressed as follows:

Nancy Patterson
A. John Harper, III
Morgan Lewis & Bockius
1000 Louisiana, Suite 4200
Houston, Texas 77002
(713) 890-5000
(713) 890-5001 (fax)


Patricia Haylon