IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROY MAYNOR | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. |
| v. | § | |
| | § | 3:07-CV-00504 |
| THE DOW CHEMICAL COMPANY | § | |
| | § | COLLECTIVE ACTION |
| Defendant. | § | |

### AFFIDAVIT OF ROBIN CAMPBELL

BEFORE ME, the undersigned authority, personally appeared Robin Campbell, known to me to be the individual whose name is subscribed below, and who after being duly sworn, deposes and states as follows:

1. My name is Robin Campbell. I am over the age of twenty-one (21). I have never been convicted of a felony or a crime of moral turpitude. I am under no legal disability and I am fully competent to make this Affidavit. I have personal knowledge of the facts and statements I have made herein. I swear that each of the statements I have made herein is true and correct.

2. I am the Labor Relations Manager for The Dow Chemical Company ("Dow"), Freeport and Texas City Operations. I have been Labor Relations Manager at all times relevant to this lawsuit. As such, I am responsible for negotiating and administering the collective bargaining agreement between Dow and Local 564 of the International Union of Operating Engineers (the "Union"). I am also a Custodian of Records for the records attached to this affidavit. I have reviewed the personnel records of Plaintiff Roy Maynor.

3. Maynor was hired by Dow as an Operator in 1974. While Maynor was employed by Dow, he was a member of Local 564 of the International Union of Operating Engineers (the "Union"). As a result, Maynor authorized the Union to negotiate the terms and conditions of his employment with Dow on his behalf.

4. On May 14, 2003, Dow and the Union executed a new collective bargaining agreement (the "CBA"). I negotiated the CBA on behalf of Dow and am familiar with its contents. Article XXXIV of the CBA, titled "Skills Initiative," set out various training agreements between the Union and Dow. Only Dow employees covered by the CBA ("Covered Employees") were subject to the terms of Article

Exhibit "D"


EXHIBIT

XXXIV. A true and correct copy of Article XXXIV of the CBA is attached hereto as Exhibit 1-A.

5. As the CBA makes clear, the express intent of the Skills Initiative was to upgrade and maintain Covered Employees' (also known as "Operators") skills, to increase the competitiveness of Covered Employees in a positive manner and to insure that all Covered Employees were given opportunities and assistance in achieving the various Skill Levels.

6. Article XXXIV stated that failure of a Covered Employee to attempt to reach the requirements of the Skills Initiative could result in disciplinary action, but if a Covered Employee is working towards achieving the Skill Levels, he may be given extra time and opportunities to succeed. As the Skills Initiative was originally conceived, failure to achieve certain Skill Levels or failure to engage in a certain type of training was not a disciplinable offense under Article XXXIV, but failure to make any attempt to achieve the goals set out in the Skills Initiative was a disciplinable offense.

7. Nothing in Article XXXIV requires Covered Employees to engage in any particular type of training and Dow did not impose any such requirement.

8. As Article XXXIV makes clear, there were several components to the Skills Initiative, including the Site Foundational Skills Program, the Process Operators Skills Program, Lab Operator Training and Departmental Training.

9. Under the Site Foundational Skills Program, all hired prior to May 14, 2003 were required to undergo a Foundational Skills Assessment, which is a test that measures Covered Employees' achievement levels in each of six Skill Categories. These six Skill Categories are: (1) Reading for Information, (2) Applied Mathematics, (3) Locating Information, (4) Teamwork, (5) Applied Technology, and (6) Observation. Within each Skill Category there are between five and seven Skill Levels, which are numbered 1 (the lowest skill level) through 7 (the highest Skill Level).

10. The CBA required that Covered Employees subject to the Site Foundational Skills Program achieve at least a Skill Level of 5 in Locating Information and Teamwork, and a Skill Level of 6 in the other four categories.

11. The Skills Categories were further divided into two groups: Foundational Skills I (Reading for Information, Applied Mathematics and Locating Information) and Foundational Skills II (Teamwork, Applied Technology and Observation). In implementing the Site Foundational Skills Program, Dow and the Union agreed that Covered Employees should achieve the requisite Skills Levels in Foundational Skills I prior to achieving the Skill Levels in the Foundational Skills II. ACT, the CBIT and Dow further agreed that employees should complete the Skill Categories in Site Foundational Skills I in the following order: (1) Reading for Information, (2) Applied Mathematics, and (3) Locating Information.

12. Dow contracted with Brazosport College's Center for Business/Industry Training (the "CBIT") and the testing firm ACT to implement the Site Foundational Skills Program. Specifically, the CBIT, on behalf of Dow, used ACT's testing protocol to conduct the Foundational Skills Assessments. The Foundational Skills Assessments were proctored exams, which were conducted at the CBIT. Once a Covered Employee's Skill Level was determined, the Covered Employee then needed to advance two Skill Levels (e.g. from Reading for Information 2 to Reading for Information 4) within a calendar year in order to be in compliance with the Site Foundational Skills Program. In order to properly implement the Site Foundational Skills Program, Covered Employees were required to execute releases so that Dow could find out whether they (1) had taken the Foundational Skills Assessments, (2) what Skill Levels they had achieved, and (3) what, if any, on-line or classroom training they had completed. These releases were required by the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g, et seq. ("FERPA").

13. Neither the CBA nor Dow imposed any particular training requirements on Covered Employees in connection with the Site Foundational Skills Program. Covered Employees were free to engage in self-study, online training, classroom training, one-on-one tutoring, or not to train at all so long as they achieved the two-level per year advancement. The only restriction placed on Covered Employees was the fact that they could only take a Foundational Skills Assessment every 90 days in the absence of some evidence that they had engaged in training. This restriction was not imposed by Dow.

14. Even though there was no particular training requirement, Dow, through its agreement with CBIT, provided various training options to Covered Employees in order to assist them with their advancement. These options included (1) on-line training programs that could be accessed through a password protected login screen on ACT's servers; (2) organized training classes specific to the various Skill Categories held at CBIT; (3) publicly available computer labs, often with instructors present, where Covered Employees could go to access the on-line training programs, review materials and/or ask questions; and (4) one-on-one tutoring.

15. As long as a Covered Employee submitted the required release, the CBIT could release data to Dow about his participation in the Site Foundational Skill Program. The only information that I received regarding Covered Employees' participation from the CBIT, however, was whether a Covered Employee reached profile, whether he advanced zero, one or two or more skill levels, and information regarding the amount of training hours recorded for him.

16. Because the Foundational Skills Program was implemented in the middle of 2003, Covered Employees were given until December 31, 2004 to advance the requisite two Skill Levels in the first year. Based on a review of the data I received at the time, and in consultation with the CBIT, I learned that within this first 18 months of the Site Foundational Skills Program, over 500 Covered Employees satisfied this requirement. These 500 plus Covered Employees spent an average of about 18.5 hours of training time to achieve a one Skill Level advancement.

3

17. Approximately 370 Covered Employees failed to achieve the two-level progression by December 31, 2004, however. Dow and the Union discussed this issue and agreed, based on the language of the CBA, that so long as the Covered Employees were making a "reasonable effort" to comply with the Site Foundational Skills Program, they would not receive disciplinary action. Dow and the Union mutually defined "reasonable effort" as engaging in 40 hours of training per year based on the 18.5 hour average per Skill Level set forth above.

18. Dow and the Union entered into a letter agreement in February 2005 called "Skills Initiative—Addressing Non-Compliance," which sets out various factual scenarios and offers guidance as to how to deal with them. A true and correct copy of this document is attached hereto as Exhibit 1-B. For example, if a Covered Employee refused to return his required release document, he was to receive a written warning. Continued non-compliance with this requirement was to result in additional disciplinary action. Similarly, failure to take any Site Foundational Skills Assessments, or failure to engage in any training, would result in disciplinary action. Nothing in this Letter Agreement mandated that Covered Employees engage in any particular type of training.

19. Despite the fact that Maynor's authorized bargaining agent agreed to the Site Foundational Skills Program, Maynor disagreed with it and, as a result, refused to submit the required release form. Dow instructed Maynor on numerous occasions to submit this form without success. True and correct copies of counseling documents issued to Maynor regarding this issue are attached hereto as Exhibit 1-C. Because Maynor refused to submit the release, Dow could not verify whether Maynor took the Assessments or engaged in reasonable efforts to comply with the Site Foundational Skills Program. Given that Maynor refused Dow's repeated orders to execute the release, and the fact that Dow could not verify whether Maynor had taken any Assessments or engaged in reasonable efforts to comply with the Site Foundational Skills Program, Dow terminated Maynor's employment for insubordination effective February 7, 2006.

20. Seven months after Maynor was fired, on September 6, 2006, the Union filed a complaint with the Department of Labor ("DOL") alleging that Dow had failed to compensate Covered Employees for engaging in what the Union believed was "required" training under the Site Foundational Skills Program. A true and correct copy of the Union's letter to the DOL, a copy of which I received from the Union, is attached hereto as Exhibit 1-D. According to the Union, at the time of this letter, 68 employees had completed all levels of the Site Foundational Skills Program.

21. Upon receipt of this letter, the DOL began an investigation and took the position that that because some Covered Employees received disciplinary action for not engaging in reasonable efforts to comply with the Site Foundational Skills Program, the training and Assessments were "mandatory" rather than "voluntary" under the applicable regulations. Dow disagreed (and continues to disagree) with the DOL's assessment of this issue. Nonetheless, without admitting liability, Dow agreed to resolve the DOL's audit by paying each Covered Employee who participated in the

4

Site Foundational Skills Program for up to 40 hours per year of training from mid-2005 through November 30, 2006, and also for all Assessments that they took. If Dow's and/or the CBIT's records reflected that Covered Employees engaged in less than 40 hours of training during the applicable time period, they were paid for the actual amount of time they spent in training. These payments were made in August and November, 2007. Maynor did not receive a payment under Dow's agreement with the DOL because Dow could not verify that Maynor had engaged in any training or taken any Assessments given his failure to sign a release.

22. In addition to paying covered employees for training and Assessments in which they actually engaged under the Site Foundational Skills Program, Dow also agreed to expunge any disciplinary records related to the Site Foundational Skills Program in the records of covered employees who were employed as of November 30, 2006. Because Maynor was not employed on this date, his disciplinary records were not expunged.

23. During their mid-term negotiations in November 2006, Dow and the Union agreed to various changes in the Site Foundational Skills Program. Specifically, Dow and the Union agreed to eliminate the two Skill Level requirement. In other words, as of November 30, 2006, Covered Employees were no longer required to advance two Skill Levels under the Site Foundational Skills Program. Dow and the Union also agreed to eliminate any disciplinary action associated with the Site Foundational Skills Program. Further, Dow and the Union agreed that Union members would be compensated for taking Site Foundational Skills Assessments. The only requirement with respect to the Site Foundational Skills Program after November 30, 2006 is that if Covered Employees want to bid into a new job, they must have completed the Site Foundational Skills Program. A true and correct copy of the executed November 30, 2006 mid-term agreement is attached hereto as Exhibit 1-E.

24. As of the date of this affidavit, it is my understanding that the following persons have filed consents to participate in this litigation: Jose Alfredo Molina, Martin Ricardo Martinez, Kenneth Nugent, Charlie Thompson, Jr., Archie Walker, Jr., Cornell Porter, Sr., Rolf Edward Miller, Jr., James E. Arnold, Anthony Craig Moody, Eric G. Wells, Leonard James Cortemelia, John Paul Haynes, Rogelio Luna, and Transit Salvador Rodriguez. I have reviewed each of these persons' personnel records. Each of these persons was covered by the Site Foundational Skills provisions of the CBA. Only James Cortemelia and Kenneth Nugent are active employees.

25. Eric Wells has been on an unpaid leave of absence since November 1, 2003. He currently works for the Union and is on the Union's payroll. He has not been paid wages by Dow since November 1, 2003. He has not taken any Foundational Skills Assessments since November 1, 2003. To the extent he has engaged in any Foundational Skills training since November 1, 2003, he has done this while working for the Union. Dow did not require Wells to engage in this training.

26. Exhibits 1-A through 1-E are documents retained by The Dow Chemical Company in the usual course of its business. These records are kept by The Dow Chemical Company in the regular course of business, and it was the regular course of business for The Dow Chemical Company for an employee, with knowledge of the acts, events, and opinions recorded, to make these records or to transmit information to be included in such records. These records were made at or near the time or reasonably soon after the events described therein. The records attached hereto are the originals or exact duplicates of the original.

Further affiant sayeth naught.

Signed this 31 day of January, 2008.

_____
Robin Campbell

SUBSCRIBED AND SWORN TO BEFORE ME on this 31 day of January, 2008.

_____
Notary Public in and for the
STATE OF TEXAS

My Commission Expires: 05/13/09



AILEEN D WILSON
NOTARY PUBLIC
State of Texas
Comm. Exp. 05-13-2009