**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | | |
|---|---|---|
| ROY MAYNOR, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. G-07-0504 |
| | § | |
| THE DOW CHEMICAL COMPANY, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER**

Roy Maynor sued his former employer, the Dow Chemical Company, under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.* Maynor alleged that Dow failed to pay him and similarly situated employees for time spent training for and taking skills-assessment tests, and that Dow retaliated against him for complaining about that policy.

The pay claim was certified as a collective action. Of the approximately 130 plaintiffs who joined the suit, all settled their claims before trial except Roy Maynor and Kenneth Nugent. Maynor's and Nugent's pay claims and Maynor's retaliation claims were tried before a jury. Dow's motions for judgment as a matter of law were denied. The jury decided that Maynor and Nugent had both spent time engaged in training activities for which they should have been compensated. The jury found that Maynor had been fired in retaliation for activity protected by the FLSA, awarding him $109,887.72 in back pay. (Docket Entry No. 256).

The following posttrial motions are now pending:

- Dow has renewed its motion for judgment on the retaliation claim only. (Docket Entry No. 258). Dow argues that there was not evidence on which a reasonable jury could have found that Maynor engaged in protected activity or was fired for doing so. In the alternative, Dow

has asked for a new trial, remittitur of the back-pay award, or a judgment that Maynor is not entitled to liquidated damages. Maynor has responded, (Docket Entry No. 263), and Dow has replied, (Docket Entry No. 266).

- Maynor has moved for reinstatement or, in the alternative, front pay. He also seeks liquidated damages on his retaliation claim. (Docket Entry No. 264) Dow has opposed all three requests, (Docket Entry No. 269), and Maynor has replied, (Docket Entry No. 272).

- Both plaintiffs have moved for entry of judgment in accordance with the jury's verdict and an award of liquidated damages on the pay claims. Both plaintiffs have also asked for $25,000 in attorney's fees on the pay claims and $54,477.50 in attorney's fees on Maynor's retaliation claim. (Docket Entry No. 265). Dow has responded, opposing liquidated damages on the pay claims, entry of final judgment on Maynor's retaliation claim, and the amount of attorney's fees claimed on the retaliation claim. (Docket Entry No. 270). Maynor has replied. (Docket Entry No. 271).

Based on the motions, responses, and replies; the trial record; and the applicable law, this court grants Dow's motion for judgment on the retaliation claim. Dow's alternative motions for relief are moot. Maynor's motions for entry of judgment, attorney's fees, front pay, reinstatement, and liquidated damages on the retaliation claim are denied because he has not prevailed on that claim. The plaintiffs' motions for entry of judgment on the pay claims, including for back pay and $25,000 in attorney's fees, are granted without opposition. The plaintiffs' motion for liquidated damages on the pay claims is granted.

The parties are ordered to confer and submit a proposed final judgment consistent with these rulings by **July 26, 2010.** The reasons for these rulings are set out below.

2

# I.     The Trial Record

For over 30 years, Maynor worked as an operator at Dow's plant in Freeport, Texas.  Maynor belonged to Local 564 of the International Union of Operating Engineers (the "Union"),which negotiated a Collective Bargaining Agreement ("CBA") with Dow.  A new CBA became effective on May 14, 2003.  Article XXXIV of this CBA established a "Skills Initiative Program."  Under Section 1 of Article XXXIV, Union members hired before May 14, 2003 had to comply with the "Site Foundational Skills Program," ("FSP").  Section 1 stated:

> Foundational Skills Assessment will be required for employees hired prior to May 14, 2003.  Employees required to obtain an associates degree will take the assessment upon completion of the degree.  The Foundational Skills include the areas of Reading, Applied Mathematics, Locating Information, Teamwork, Applied Technology and Observation (the "Skill Category(s)").  In each Skill Category there are different Skill Levels, 3, 4, 5, 6 and 7 ("Skill Levels").  Each employee will be required to take a skills assessment to determine the level they are at, paid for by the COMPANY.  Once the Skill Level has been determined, an employee will be expected to move up at least 2 Skill Levels per year until the employee has achieved the required level in all the Skill Categories.  Employees must reach a Skill Level of 5 in Locating Information and Teamwork and a Skill Level of 6 in the other four categories.

(Dow Ex. 1).[1]

Dow administered the FSP through nearby Brazosport College.  The assessment tests were administered by ACT, a national testing service, at the College.  The College made options available for employees to train for the tests, at Dow's expense.  The options included accessing online training programs, attending classes on the materials covered in the assessment tests, attending one-on-one tutoring, visiting computer labs, and obtaining self-study materials, including workbooks and CDs prepared by ACT.

---

[1]   The exhibits cited are the parties' trial exhibits.

In December 2003, Dow and the Union reached an agreement to address the means by which Dow would learn how employees were progressing on the FSP requirements. Dow and the Union agreed on a customized FERPA[2] release form. Dow would not request employees' individual test scores "except as may be needed for skills initiative management." (Dow Ex. 7). The information Dow and the Union agreed Dow would receive included whether the employee had taken the orientation class, taken certain assessments, enrolled in training courses, taken reassessments, reached profile in a given area, or passed the tests required to meet the FSP requirements. (*Id.*). Once this agreement was in place and employees began signing releases, Dow began receiving monthly reports from the College. (Tr. at 169).

Dow's Labor Relations Manager, Robin Campbell, testified at trial that the FERPA form was customized to address privacy concerns. (Tr. at 166-68). Campbell also testified about Dow's reason for having employees sign the release forms and obtaining the information about the employee's training and test results directly from the College rather than allowing employees to provide the information to their supervisors. "There is a lot of plants, a lot of leaders, a lot of people . . . [Y]ou can get consistent data, going to the right people in a well structured atmosphere." (Tr. at 184).

Maynor did not sign the customized FERPA release form when it was first circulated. On January 9, 2004, Maynor's supervisor, Cheryl Weinberger, sent an e-mail to him and other employees, attaching the FERPA release form. The e-mail stated:

---

[2] FERPA refers to the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g. The statute conditions availability of federal funds to educational institutions on their implementing certain privacy and recordkeeping procedures. One of the conditions is that educational records not be released to third parties without the student's consent. The FERPA release form referred to in the present case provided the College with consent to release employee records to Dow.

4

> If you received this message, Brazosport College does not have your
> College Release form. Without this form, you cannot receive the
> LRA once you reach profile. If you want credit for the training
> classes you are taking, please sign the form and return to the college.
> The college cannot transfer your training records to Dow without this
> form signed. If you have any questions about what this release form
> means, please contact Michael Smith.

(Dow Ex. 13). Weinberger sent subsequent reminder e-mails to Maynor and a dwindling number of other Dow employees on February 18, 2004, March 19, 2004, April 16, 2004, May 21, 2004, July 16, 2004, August 13, 2004, September 14, 2004, October 25, 2004, November 19, 2004, and December 14, 2004. (Dow Exs. 14-23). The December 14, 2004 e-mail stated: "If the release form is not received at [the College] by December 22 at 2:00pm, you will not receive credit for turning it in this year and will automatically receive a step in discipline." (Dow Ex. 23). Maynor received all of these e-mails with the attached release forms. He continued to refuse to sign the FERPA form. (Tr. at 296-97).

On February 3, 2005, Weinberger issued Maynor a written disciplinary letter based on his failure to meet the 2004 FSP requirements. (Maynor Ex. 10). The letter warned Maynor that he would have until June 30, 2005 to satisfy the FSP requirement that he advance two skill levels on his assessments for 2004, and that he would have until December 31 to satisfy the two-level-advancement requirement for 2005. (*Id.*). Campbell testified that other employees received warning letters around the same time. (Tr. at 185).

During this period, employees who had signed FERPA releases were having difficulty advancing two skill levels. On February 15, 2005, Dow and the Union entered into an Agreement addressing the appropriate discipline for employees who failed to achieve the required skill-level advancement. (Dow Ex. 2). The 2005 Agreement, entitled "Skills Initiative – Addressing Non-Compliances," was "created as a guideline for site consistency in addressing non-compliances as

5

it relates to the contractual requirements on Foundational I & II skills initiatives." The Agreement

provided "examples of different situations and the guidelines on how to address them" grouped into

three "Tiers." (*Id.* at 2). "Tier I" scenarios, including failing to sign the privacy release form,

signing the release form but not taking any Assessments, and signing the release form but not having

any activity after that, were to be addressed through a written warning or through progressive

discipline "[i]f discipline above the level exists." (*Id.*). Signing the release form, taking the

Foundational Skills Assessments, and enrolling in training, but failing to advance two skill levels

per year, was classified as a "Tier II" scenario if the employee had less than forty hours of training

and as a "Tier III" scenario if the employee had forty or more hours of training. A Tier II scenario

warranted progressive discipline up to time off without pay or a more severe penalty (but not

termination) if the employee's last disciplinary action was time off without pay. The Tier II

approach was to allow employees who had made "reasonable efforts" to improve the assessment test

results—by taking at least 40 hours of class training or online training reported to Dow—a chance

to avoid job termination despite unsatisfactory test results. A Tier III scenario would lead to an

employee receiving a "letter of expectations" establishing a time frame for completing the required

skill levels. (*Id.*). These guidelines applied to all employees for the 2005 requirements. Employee

discipline resulting from noncompliance in 2004 was reversed unless the employee "clearly put in

no effort to improve their skills, as defined in the Tier I" guidelines, in which case they would be

disciplined under Tier I. (*Id.* at 1).

Under the February 2005 Agreement, Maynor's refusal to sign the FERPA release was a Tier

I scenario. On February 21, 2005, Maynor received another e-mail from Weinberger asking him to

sign the release form. By then, Maynor was the only employee under Weinberger's supervision who

had not signed the form. (Tr. at 226-28). That e-mail informed Maynor that he was required to

6

complete the first two skill levels by June 30, 2005 and the next two skill levels by December 31, 2005. Weinberger stated that "[w]ithout the college information, I will have to assume that you have done nothing to achieve the Skills Initiative Requirement (a.k.a. I will initiate the next level of disciplinary action)." (Dow Ex. 48 at 912). On February 23, 2005, Maynor asked for and was given a copy of the February 2005 Agreement between the Union and Dow. (Dow Ex. 48 at 919). Maynor testified that in February 2005, he knew he could be fired for failing to comply with the FSP. (Tr. at 308).

In March 2005, Charlie Singletary, the Union representative, informed Maynor that the Union could not file a grievance on his behalf. On March 15, Maynor filed a written grievance with Bill Lewis, the head of Human Resources at Dow's Freeport facility. (Tr. at 308-09). Maynor's letter to Lewis stated in full as follows:

> On February 3, 2005, I received a written letter for failure to meet annual skills assessment by not signing the college release form. I request the company to remove this letter from my personnel file.
>
> On 2-15-2005 the company and the union agreed to a non compliance agreement which I also disagree with. This grievance should be considered timely as of this date.

(Dow Ex. 27). Lewis rejected Maynor's grievance on March 16, 2005 because his complaint about the warning letter was untimely and because his complaint about the noncompliance agreement was a dispute between him and the Union. (Dow Ex. 28).

On March 28, 2005, April 18, 2005, May 16, 2005, and June 16, 2005, Weinberger sent Manyor additional e-mail warnings that failing to turn in his FERPA form would result in the next disciplinary step. (Dow Ex. 48 at 912-15). All these e-mails reminded Maynor that by June 30, he was required to advance two levels and sign the FERPA release so Dow could obtain the information about his progress from the College. (*Id.*). Maynor did not sign the release form. (Tr.

7

at 188).  Instead, on June 21, 2005, he filed a Charge of Discrimination with the EEOC.  (Dow Ex.

29).  Maynor testified that the document was typed by an EEOC representative who interviewed

him.  (Tr. at 310-11).  The boxes for "age" and "retaliation" discrimination are checked.  Maynor

testified at trial that he did not know why the "retaliation" box was checked.  He could not remember

making any complaints to anyone at Dow before he filed the EEOC charge about not being paid

overtime for FSP activities.  (Tr. at 312-14).

The narrative in the EEOC Charge of Discrimination described the basis for Maynor's age

discrimination complaint, as follows:

> I was hired in July 1974.  I am an operator in the Chlorine III
> Department.  On or about February 3, 2005, and continuing, I have
> been required to go to school after work and required to take and pass
> the computerized written tests in order to retain my employment with
> the company.
>
> Around May 2003, the company and the union included provisions
> in the union contract requiring hourly employees to go to school and
> take and pass the tests.  If the employee fails the tests, he or she is
> given progressive discipline – a letter, time off, and termination.  This
> new job requirement for hourly employees adversely affects and
> discriminates against the group of workers who are over the age of
> forty.
>
> Cheryl Weinberger, Superintendent, told me that I needed to go to
> school and instructed me to sign a release form so the company could
> get all my school information from Brazosport Junior College.
>
> I believe that I and the class of workers who are over the age of forty
> have been discriminated against because of our age, in violation of
> the Age Discrimination in Employment Act of 1967, as amended.  I
> and other older workers have performed our jobs in a satisfactory
> manner for many years without having to be adversely impacted by
> a requirement to take a test.  Most of the older workers are failing the
> tests whereas the younger workers pass at a much higher rate.  Many
> workers say that the tests are not job related.

(Dow Ex. 29).

On August 10, 2005, Dow sent Maynor a letter suspending him for one day without pay because of his failure to advance two skill levels, "a serious performance deficiency." (Dow Ex. 48 at 911). Dow suspended other employees at the same time for failing to comply with the FSP. (Tr. at 88). Maynor's written suspension letter stated that he was required to advance four skill levels by December 31, 2005. The letter stated that Dow expected Maynor "to modify [his] behavior immediately to comply fully with the skills initiative requirements described above" and that "[a]ny future policy or rule violations or workplace misconduct will lead to further discipline, up to and including termination of [his] employment." (Dow Ex. 48 at 911).

After receiving this letter, Maynor wrote to Bill Lewis on August 10, 2005. The letter stated:

> On August 10, 2005 I received a written letter, one day suspension without pay, and loss of my 2005 Performance Award, for failure to meet skills initiative requirements. Further, I feel this discipline is also for not signing the college release form.
>
> I request the company to remove this letter from my personnel file, reimburse me one day lost pay, and reinstate my 2005 Performance Award.
>
> I personally feel this is harassment due to the fact the company is aware that I am working with the EEOC to resolve this problem.

(Dow Ex. 30). On August 15, 2005, Maynor amended his EEOC charge to include the following:

> On August 11, 2005, I was suspended without pay for one day which caused me to lose my performance award.
>
> On August 10, 2005, Cheryl Weinberger, Production Leader, told me that Human Resources told her to give me a letter, which stated that I was being suspended due to failure to meet the skills initiative annual requirements and serious performance deficiencies. The letter was signed by Ms. Weinberger.
>
> I believe that I have been discriminated against because of my age, 49, and because I filed my prior charge of discrimination against the

9

> company, in violation of the Age Discrimination in Employment Act
> of 1967, as amended. I am the top worker in my block. If anything
> needs to be done, the Operators and Engineers come to me and ask
> me how to do it.

(Dow Ex. 31). In August 2005, Singletary told Maynor that he would be disciplined again if he did

not sign a release form. (Tr. at 331-32). Maynor did not sign the form.

Weinberger sent Maynor additional reminder e-mails about the release form on August 15,

2005, October 19, 2005, November 14, 2005, and December 9, 2005. All these e-mails stated that

Maynor would face the next step in progressive discipline if he failed to sign the form. (Dow Ex.

48 at 940-43). On December 20, 2005, Maynor went to Brazosport College to ask for a record of

his training hours and test scores to be printed on "transcript-type tamper-proof paper." Ellen

McDonald, a College employee, e-mailed Campbell, Weinberger, and Maynor the same day

describing this request and asking for permission to provide the "report after the first of the year, in

a time frame consistent with the normal monthly report to Dow." (Maynor Ex. 12). McDonald

stated that "since Mr. Maynor has not signed a release, we will provide the report directly to him."

(*Id.*).

On December 21, 2005, Campbell wrote Maynor an e-mail responding to his request for an

arbitration. Campbell offered to meet with Maynor or speak with him on the phone. He also stated:

> [Y]our concern seemed to be around signing the FERPA. I tried to
> put you at ease by discussing what information we get from the
> College, clearly stated – only the information related to the skills
> initiative. The FERPA we are using was agreed to by the Union, we
> have a signed agreement.
> . . .
>
> Roy, you are represented by a Union, the Union and the Company
> agreed to a contract in 2003, it was ratified by a majority of the union
> membership. Please reconsider the current position you are taking
> regarding signing the FERPA, at the end of the month we will

> generate the 2005 final report and we will follow our current process
> which is progressive discipline for Tier I non-compliances.

(Dow Ex. 33).  Maynor was asked about this letter at trial.  Maynor testified that he understood

Campbell was telling him he would be fired if he did not sign the FERPA release.  (Tr. at 326).

Maynor met with Campbell on December 23, 2005.  Campbell's notes from the meeting state

that "Roy really seemed focus [sic] that his issue was us forcing them to go do this on their own

time." (Maynor Ex. 16).  Campbell testified at trial that at this meeting Maynor complained for the

first time about not being paid for training and studying, and that this complaint stood out because

it was different from the issues Maynor had raised previously.  (Tr. at 146).  At this meeting with

Maynor, Campbell reviewed the agreement between Dow and the Union on the FERPA form as well

as the 2005 Addressing Non-Compliances Agreement.  In his notes, Campbell wrote:

> I told Roy I just want him to be sure this is the direction he wants to
> go.  I showed him in the Skill Initiative Non-Compliances where he
> feel [sic], where he is in progressive discipline, and what the final
> step is.  He can do whatever he wants, but I want him to be
> knowledgeable of where this will end up under his current direction.

> Roy said he had been out here for 32 years and would be 50 in May,
> 2006.  He plans on retiring then but this could impact those plans.  I
> agreed with Roy under his current direction.

(Maynor Ex. 16).

On January 3, 2006, Maynor gave Weinberger a sealed envelope from Brazosport College

containing a paper copy of his training hours report and test scores.  Weinberger told Maynor in an

e-mail that Campbell would be meeting with the legal department on January 9 and that "[a]t that

time, they will consider your request to accept the paper-copies of your college information," until

which time she would "keep the packet in [her] office."  (Maynor Ex. 14).  Testimony at trial

revealed that Dow never opened the envelope and returned it to Maynor still sealed.

On February 15, 2006, Dow terminated Maynor's employment.  On February 20, Singletary e-mailed Campbell to ask for a list of the reasons why Maynor was fired.  Campbell replied: "Mr. Maynor was terminated for policy non-compliance, specifically not meeting the skill initiative requirement."  (Maynor Ex. 15).

After his firing, on February 27, 2006, Maynor amended his EEOC charge again to add:

> On February 15, 2006, I was discharged from my position.
>
> Cheryl Weinberger, Production Leader, told me that I no longer worked for Dow Chemical.  I asked her why and she said that it was policy noncompliance.
>
> I believe that I have been discriminated against because of my age, 49, and because I filed a prior charge against the company, in violation of the Age Discrimination in Employment Act of 1967, as amended.  The company management preached about a new culture of younger people who pick up new policies and technology better. I complied with policies and procedures and my work performance was excellent.

(Dow Ex. 31).   Maynor filed three grievances in connection with the discipline and the job termination.  Maynor requested and was denied an internal arbitration hearing.  The termination was upheld in a National Labor Relations Board grievance hearing.  (Dow Exs. 39-43).

Maynor filed this FLSA lawsuit on October 9, 2007.  (Docket Entry No. 1).  On May 28, 2008, this court conditionally certified a class under the FLSA made up of:

> current and former members of the International Union of Operating Engineers Local No. 564 employed by Dow at the Dow facility in Freeport, Texas and hired before May 14, 2003 who were required to undergo training and testing in order to comply with the Site Foundational Skills section of the collective bargaining agreement between Dow and the Union between October 9, 2004 and November 30, 2006.

(Docket Entry No. 42 at 26).  Notice was sent to the class members.  Approximately 130 opted into the suit.  On November 25, 2009, this court denied Dow's motion to decertify the class.  (Docket

Entry No. 205).  This court granted the plaintiffs' motion for partial summary judgment that they had not waived their claims for overtime pay by accepting payment from Dow in a settlement between the company and the Labor Department, and granted in part and denied in part the plaintiffs' motion that the time they spent studying or training for the tests was compensable as a matter of law.  This court also denied Dow's motion for summary judgment as to Maynor's pay and retaliation claims.

Before trial, all the plaintiffs settled except Maynor and Nugent.  The case proceeded to trial in March 2010 on both plaintiffs' pay claims and on Maynor's retaliation claim.  This court denied Dow's motions for judgment as a matter of law at the close of the plaintiffs' case and again after the close of evidence.  The jury decided that both Maynor and Nugent had spent compensable time engaged in College-related training preparing for FSP assessments, 180 hours for Nugent and 27 hours for Maynor.  The jury concluded that Dow's FLSA violation was not willful.  On Maynor's retaliation claim, the jury concluded that Maynor had engaged in activity protected by the FLSA and that Dow terminated his employment because of that protected activity.  The jury awarded Maynor $109,887.72 in back pay on that claim and found that Maynor had not failed to mitigate damages. (Docket Entry No. 256).

Dow has renewed its motion for judgment on the retaliation claim only.  (Docket Entry No. 258).  In the alternative, Dow has asked for a new trial, remittitur of the back pay award, or a judgment that Maynor is not entitled to liquidated damages.  Maynor has moved for reinstatement or, in the alternative, an award of front pay.  He also seeks liquidated damages on his retaliation claim.  (Docket Entry No. 264).  Both plaintiffs have moved for entry of judgment in accordance with the jury's verdict, an award of liquidated damages on the pay claims, and attorney's fees for all claims.  (Docket Entry No. 265).  Responses and replies to each motion have been filed.  Dow

does not oppose entry of judgment on the back pay award for the pay claims or the attorney's fees on those claims.  The opposed motions are discussed below.

## II.       The Legal Standard

A motion for judgment as a matter of law is appropriate when a party has been fully heard on an issue and reviewing the entire record shows no legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party on that issue.  FED. R. CIV. P. 50(a).  *DP Solutions, Inc. v. Rollins, Inc.*, 353 F.3d 421, 427 (5th Cir. 2003).  In evaluating the record, the court must make all reasonable inferences for the nonmoving party.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097 (2000).  Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.  *DP Solutions*, 353 F.3d at 427 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505 (1986)).  "[T]he standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'"  *Reeves*, 530 U.S. at 150, 120 S. Ct. 2097 (quoting *Anderson*, 477 U.S. at 250-51, 106 S. Ct. 2505).  A court may grant a motion for judgment as a matter of law "only when the facts and reasonable inferences are such that a reasonable juror could not reach a contrary verdict."  *Baltazor v. Holmes*, 162 F.3d 368, 373 (5th Cir. 1998); *see also Texas Farm Bureau v. United States*, 53 F.3d 120, 123 (5th Cir. 1995).

In considering a Rule 50 motion for judgment as a matter of law following a jury verdict, the court must be "especially deferential" to the jury's findings.  *Brown v. Bryan County, OK*, 219 F.3d 450, 456 (5th Cir. 2000).  The Fifth Circuit's standard for reviewing a jury verdict is whether "the state of proof is such that reasonable and impartial minds could reach the conclusion the jury expressed in its verdict."  *Am. Home Assur. Co. v. United Space Alliance*, 378 F.3d 482, 487 (5th

Cir. 2004) (quoting *Liberty Mut. Ins. Co. v. Falgoust*, 386 F.2d 248, 253 (5th Cir. 1967)).  A jury

verdict must stand unless there is a lack of substantial evidence, viewed in the light most favorable

to the successful party, to support the jury's factual findings, or the legal conclusions implied from

the jury's verdict cannot, in law, be supported by those findings.  *Id.*

The fact that a court denies summary judgment does not preclude granting judgment as a

matter of law based on the full trial record.  *Abel v. Dubberly*, 210 F.3d 1334, 1337 (11th Cir. 2000);

*Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 n.1 (2d. Cir. 1999) (Sotomayor, J.); *DeMaine*

*v. BankOne*, 904 F.2d 219, 221 (4th Cir. 1990); *Gross v. Southern Ry. Co.*, 446 F.2d 1057, 1060 (5th

Cir. 1971) ("It is settled in this Circuit, therefore, that prior denial of summary judgment does not

rule out the possibility of a subsequent directed verdict.").  Dow made the necessary motions during

the trial to support its renewed motion for judgment as a matter of law.  *See* FED. R. CIV. P. 50(b);

*Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 288 (5th Cir. 2007);  *Allied Bank-West v.*

*Stein*, 996 F.2d 111, 114-15 (5th Cir. 1993).

## III.   Analysis

Maynor's retaliation claim arises under section 15(a)(3) of the FLSA, which makes it

unlawful:

> to discharge or in any other manner discriminate against any
> employee because such employee has filed any complaint or
> instituted or caused to be instituted any proceeding under or related
> to this chapter, or has testified or is about to testify in any such
> proceeding, or has served or is about to serve on an industry
> committee

29 U.S.C. § 215(a)(3).  Maynor must show that Dow took the challenged actions against him

"because of" his protected activity.  *Id.* (citing *Kanida v. Gulf Coast Medical Personnel LP*, 363

F.3d 568, 576 (5th Cir. 2004)).  This is a "but for" causation standard.  *Kanida*, 363 F.3d at 580.

Because there was a trial on the merits, there is no need to address whether Maynor made out a *prima facie* case. *See Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 468 (5th Cir. 2002) ("when a full trial on the merits has been conducted, this Court focuses not on the plaintiff's *prima facie* case, but on the ultimate question of whether the record contains sufficient evidence to support a jury finding of race discrimination"); *Thomas v. Texas Dept. of Criminal Justice*, 220 F.3d 389, 393 (5th Cir. 2000). The verdict stands if Maynor presented sufficient evidence at trial on which a reasonable jury could find that he (1) engaged in protected activity and (2) that he would not have been fired but for that activity.

### A.   Protected Activity

The question on this first issue is whether Maynor "filed any complaint" under section 215(a)(3). *See Hagan*, 529 F.3d at 623. The Fifth Circuit has construed that language to allow "an informal, internal complaint to constitute protected activity under Section 215(a)(3)." *Id.* at 626. But there are limits. "[N]ot all abstract grumblings or vague expressions of discontent are actionable as complaints." *Id.* (citations and quotations omitted). The informal complaint must "concern some violation of law" and be "framed . . . in terms of the potential illegality" of the action. *Id.* In *Hagan*, the court found that the plaintiff's complaints about a schedule change were not protected activity because he did not contend—or, as he testified, even subjectively believe—that the change was illegal. The schedule change was in fact legal. The plaintiff had raised concerns "about the possibility" of employees receiving less overtime pay, not about any violation of the law. *Id.*

In this case, none of Maynor's pretermination written complaints—two letters to Bill Lewis, an EEOC charge, and an amended EEOC charge—described any conduct that could be understood as a possible violation of the FLSA. Those complaints all related to age discrimination. The case law is clear that to be protected conduct, there must be a complaint about the failure to pay for time

16

spent on work, whether it is overtime or failure to pay minimum wage.  *See Hagan*, 529 F.3d at 626 (denying relief where the employee "did not frame *any* of his objections in terms of the potential illegality of the charge" under the FLSA (emphasis original)).  The only complaint Maynor made about unpaid overtime was not in writing.

As discussed in the November 25, 2009 Memorandum and Order, it is an open issue in the Fifth Circuit whether a complaint must be in writing to constitute protected activity.  In the Seventh Circuit, only written complaints can amount to protected activity.  *See Kasten v. Saint-Gobain Performance Plastics Corp.*, 570 F.3d 834, 839 (7th Cir. 2009).  The *Kasten* court reached that conclusion by analyzing the words "to file."  The dictionary meaning and common understanding supported the conclusion that "the phrase 'file any complaint' requires the submission of some writing to an employer, court, or administrative body." *Id.* at 838-39.  The panel also compared the language Congress chose for the FLSA's antiretaliation provision to the antiretaliation provisions in Title VII and the Age Discrimination in Employment Act.  *Id.* at 840.  In Title VII and the ADEA, Congress provided protection to employees who "ha[d] opposed any practice" made unlawful by the statute.  *See* 42 U.S.C. § 2000e-3(a); 29 U.S.C. § 623(d).  By contrast, the FLSA antirretaliation provision protects an employee who has "filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter," has "testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee."  The court in *Kasten* concluded that Congress used the phrase "file any complaint" to limit the antiretaliation provision to employees who had filed written complaints.  *Kasten*, 570 F.3d at 840.

One problem with *Kasten* is the comparison between the language in Title VII and the ADEA on one hand and the FLSA on the other.  The FLSA provision was drafted in 1938 and has not been amended.  The Title VII and ADEA provisions were enacted in the 1960s.  Another

problem is that the Fifth Circuit has disagreed with the reasoning of a case *Kasten* relied on.  That case, *Lambert v. Genesee Hospital*, 10 F.3d 46 (2d Cir. 1993), interpreted the FLSA provision as limiting "the cause of action to retaliation for filing formal complaints, instituting a proceeding, or testifying, but does not encompass complaints made to a supervisor."  *Id.* at 55.  The Fifth Circuit rejected the *Lambert* holding as too narrow in deciding that informal complaints to a supervisor satisfied the statute.  *Hagan*, 529 F.3d at 626.  Whether reading § 215(a)(3) to require a written complaint would also be too narrow is unclear.[3]

 After the trial in this case, the Supreme Court granted *certiorari* in *Kasten v. Saint-Gobain Performance Plastics Corp.*, No. 09-834, --- S. Ct. ----, 2010 WL 128339 (Mar. 22, 2010), on the following question: "Is an oral complaint of a violation of the Fair Labor Standards Act protected conduct under the anti-retaliation provision, 29 U.S.C. § 215(a)(3)?"  *See* Petition for Writ of Certiorari, *Kasten*, No. 09-834, 2010 WL 146471 (Jan. 12, 2010).  The Seventh Circuit's holding in *Kasten* is not binding on this court and may be overturned by the Supreme Court.  This court does not apply *Kasten* to require a written complaint.

Maynor did make one oral complaint about the lack of pay for studying and testing.  That was to Robin Campbell during their meeting on December 23, 2005.  In his notes from the meeting, Campbell observed that "Roy really seemed focus [sic] that his issue was us forcing them to go do this on their own time." (Maynor Ex. 16).  Campbell testified at trial that he "wrote it as 'focus' because I hadn't heard that from Roy before." (Tr. at 146).  The notes show that the two men discussed why Dow paid employees for attending an orientation session but not for attending training courses. (Maynor Ex. 16).  This evidence was sufficient for a jury to conclude that Maynor

---

[3]  The *Hagan* opinion suggests but does not specify that the complaints at issue in that case were verbal and unwritten.  529 F.3d at 620-21.

raised more than an "abstract grumbling or vague expression[] of discontent" about failure to pay for compensable hours. *See Hagan*, 529 F.3d at 626. This evidence supports a conclusion that Maynor made an oral complaint that he and other employees were required to train and study for the assessments without pay.

It does not affect the analysis that Maynor did not specifically state that Dow's policy violated the FLSA. *Lambert v. Ackerley*, 180 F.3d 997, 1008 (9th Cir. 1999) (en banc) ("it is clear that so long as an employee communicates the *substance* of his allegations to the employer (e.g., that the employer has failed to pay adequate overtime, or has failed to pay the minimum wage), he is protected by § 215(a)(3)." (emphasis original)). Even though Maynor did not communicate the substance of his FLSA allegations to Dow in a written complaint, he communicated to Campbell verbally that the "focus" of his complaint was Dow's failure to compensate employees for time spent participating in the FSP. Under current law, there was sufficient evidence for a jury to find that Maynor engaged in protected activity by making the one oral complaint to Campbell in December 2005.

## B.    Causation

The second issue is whether a reasonable jury could find that Maynor was fired because of the oral complaint he made to Campbell. In the November 25, 2009 Memorandum and Order, this court allowed the retaliation claim to proceed to trial on very narrow grounds. Maynor's arguments that there was temporal proximity between his complaint and his termination and that there was a close relationship between the FERPA requirement and the activities he complained about did not create fact issues for a jury. Instead, this court held that a fact issue was present because Maynor had given Dow the paper copy of his training hours and test results from Brazosport College a month before he was fired. (Docket Entry No. 205 at 38-40). The opinion stated:

> There is no evidence as to whether Dow concluded that without the release, it could not look at information compiled by Brazosport College about Maynor's tests and training, even if Maynor himself gave Dow the information. There is no evidence that Dow believed there was any issue about the reliability or accuracy of the transcript information Maynor provided. Given the lack of such evidence and the short time between Maynor's complaint and his firing, there is a disputed fact issue as to whether Dow's explanation that it fired Maynor for failing to sign the release form is a pretext for retaliation for the complaints he made. *See Laxton v. Gap Inc*., 333 F.3d at 578. Dow's motion for summary judgment on Maynor's retaliation claim is denied.

(*Id.* at 40).

In denying Dow's summary judgment motion, this court noted the absence of evidence explaining why Dow failed to open the sealed envelope containing the record of Maynor's studying and test scores and on the temporal proximity between his complaint to Campbell and his firing. At trial, Maynor did not present any new evidence on which a jury could have found that Maynor was fired because he complained about unpaid compensable time. Dow introduced evidence at trial to explain why Maynor's paper transcript was not an acceptable substitute for his signing the FERPA release.

The following exchange occurred during the examination of Robin Campbell by counsel for Dow:

> Q:    Okay. Talk about the FERPA. Talk about the monthly reports. Why couldn't Dow have just had a system where employees can bring information about what they're doing at the college to their various supervisors?
>
> A:    There is a lot of plants, a lot of leaders, a lot of people. So Dow is well-known for processes and procedures, so you can get consistent data, going to the right people in a well structured atmosphere.

(Tr. at 184).  This evidence at trial showed that Dow needed the monthly reports from the College containing the information about each employee's training for the assessment tests and the test results, in order to have the data reported in a consistent and reliable manner.

This evidence, and the evidence about Dow's agreement with the Union on the FERPA release, was not previously in the record.  The trial evidence showed that Dow tailored the FERPA release to address the Union's concerns about employees' privacy.  The Union and Dow agreed to limit the amount of information Dow could obtain from Brazosport College using the FERPA release form.  In 2004, the reports Dow could obtain did not include training hours because Dow did not have any reason to examine how much effort employees were expending to prepare for the assessments.  After Dow and the Union reached the February 2005 Agreement setting up the tiered discipline system, it was necessary for Dow to track training hours.  The College customized its reports to include training hours.  The FERPA release allowed Dow to ensure that it received the proper—"consistent," in Campbell's words—information about each employee.  As Campbell explained at trial, no exception was made for Maynor because "[w]e had a process that everybody followed.  We were going to follow the process."  (Tr. at 151).

Unlike the summary judgment record, on the full trial record, it can no longer be said that "the FERPA release requirement was the means to obtain information from Brazosport College, not an end in itself."  (*See* Docket Entry No. 205 at 40).  To the contrary, the full trial record shows that the FERPA requirement was negotiated between Dow and the Union and was important to Dow because it ensured that the FSP requirements were efficient, uniform, and reliable.  The trial evidence makes clear that signed releases were critical to the manner and form in which Dow received the information from the College.

21

There is ample evidence showing that Maynor was fired because he repeatedly refused to comply with Dow's requirement to sign a FERPA release form. Weinberger sent Maynor monthly e-mails in 2004 urging him to sign a release form. Beginning in March, the e-mails stated that "[t]he Union has an agreement with the Company on what information will be requested from the college, and this is the form that will allow it to happen." (Dow Exs. 14-23). Even after the December 2004 e-mail stated that Maynor would receive a progressive discipline step if he failed to comply by December 22, Maynor did not sign a release. (Dow Ex. 23). On February 3, 2005, consistent with this warning, Maynor received a warning letter in his file stating that further discipline could result from failure to comply with the FSP. Maynor signed to indicate that he understood "the requirements and expectations." (Dow Ex. 48 at 923). On February 23, 2005, Maynor asked for and received a copy of the 2005 Agreement between Dow and the Union creating the tiered discipline system. That Agreement clearly stated that an employee who had not signed the College release form would receive a written warning followed by progressive discipline. (Dow Ex. 48 at 919-22). Weinberger continued to send written warnings throughout 2005, reminding Maynor of the Union's agreement with Dow requiring the FERPA release and stating that the next discipline step would result if Maynor failed to comply by June 30, 2005. (Dow Ex. 48 at 912-16). Maynor did not sign the FERPA release.

Dow initiated the next disciplinary step on August 10, 2005 by suspending Maynor for one day without pay. He was told in a written letter that "by December 31, 2005, the data must reflect competition of 4 skill levels." Maynor signed this letter. (Dow Ex. 48 at 911). He did not sign a FERPA release. He received further reminder e-mails from Weinberger on August 15, 2005, October 19, 2005, November 14, 2005, and December 9, 2005, all warning him that the next disciplinary step would be taken if he failed to comply by December 31. (Dow Ex. 48 at 940-43).

22

On December 21, Campbell asked Maynor to "reconsider the current position you are taking regarding signing the FERPA, at the end of the month we will generate the 2005 final report and we will follow our current process which is progressive discipline for Tier I non-compliances." (Dow Ex. 33). Campbell offered to meet with Maynor and encouraged him to call with any questions. (*Id.*). Manyor testified that he understood he would be fired if he did not sign a FERPA release. (Tr. at 326). He refused to sign the form. On December 23, Campbell met with Maynor and gave him one final push to comply with the policy. Campbell again explained the FERPA agreement between Dow and the Union and told Maynor that he would receive the next step in discipline—termination—if he did not submit a release form. Maynor chose not to do so.

Maynor was given opportunity after opportunity to comply with the FERPA requirement that had been negotiated by the Union. He was disciplined and ultimately terminated because he repeatedly refused to sign the form, despite urging by Dow and the Union. No other employee refused to sign the FERPA form after February 2005. There is no evidence that Dow disciplined Maynor for any reason other than his failure to sign the form. Dow knew long before Maynor was fired that he opposed the training and assessment requirements. There is no evidence that he was fired because of that opposition. The evidence does not show that Dow harbored any hostility toward Maynor. Campbell went out of his way to work with Maynor and explain the FERPA requirement. On October 3, 2005, Weinberger nominated Maynor for an Operational Excellence award. (Dow Ex. 32).

Dow's disciplinary steps were consistent with its stated policy. The 2005 Agreement specifically stated that employees who refused to sign FERPA releases would be included in disciplinary Tier I and given progressive discipline beginning with a written warning. Other employees were given warning letters in February 2005 for failing to sign a release form; all but

Maynor signed.  Other employees were suspended in August 2005 for FSP noncompliance, although not for failing to sign the FERPA release because there were no such other employees.  After Maynor was suspended, he knew that he would be terminated if he failed to sign a FERPA release by the end of 2005.  This was reiterated by Campbell as late as December 23, 2005.  Maynor chose not to sign the form.  Consistent with Dow's warnings and stated policy, it then terminated Maynor's employment.  As the Fifth Circuit has stated, "Title VII's protection against retaliation does not permit EEO complainants to disregard work rules or job requirements."  *Swanson v. General Services Admin.*, 110 F.3d 1180, 1188 n.3 (1997).  The same applies to a plaintiff making an FLSA retaliation claim.  Maynor cannot succeed on his  retaliation claim on this record.

The temporal proximity between Maynor's complaint to Campbell and his termination.  This, standing alone, is not sufficient evidence for a jury to find in Maynor's favor on the retaliation claim.  See *Strong v. Univ. Healthcare System, LLC*, 482 F.3d. 802, 807-08 (5th Cir. 2007) ("temporal proximity alone is insufficient to prove but for causation."); *Shirley v. Chrysler First, Inc.*, 970 F.2d 39 (5th Cir. 1992) (temporal proximity is only "one of the elements in the entire calculation").  The temporal proximity argument is also undercut by the other facts in the record.  Maynor was given two years of notice that he had to sign the FERPA release form.  December 31, 2005 was established as the target date for providing proof of advancement under the FSP.  After August 2005, the December 31, 2005 date was the date by which Maynor had to submit such proof or be fired.  Maynor did not complain about pay until long after that, on December 23, 2005.  Dow was not required to abandon its plans to discipline Maynor for insubordination because he made an oral complaint about lack of pay for time spent working.  *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 272, 121 S. Ct. 1508 (2001) ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously

contemplated, though not yet definitively determined, is no evidence whatever of causality."); *Fanning v. Metropolitan Transit Authority of Harris Cnty.*, 141 F.App'x 311 (5th Cir. 2005) (per curiam) (unpublished) (generalizing *Breeden* to state that employers need not suspend previously planned employment actions upon discovering an EEOC complaint).

As a matter of law, on the complete trial record, there was not sufficient evidence to support a verdict that Maynor was fired because he engaged in activity protected by the FLSA.

## IV.   Liquidated Damages

One disputed issue remains.  The plaintiffs have requested liquidated damages on their pay claims, which were brought under 29 U.S.C. § 206.  The FLSA provides that "[a]ny employer who violates the provisions of section 206 . . .*shall be liable* to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, *and in an additional equal amount as liquidated damages*."  29 U.S.C. § 216(b) (emphasis added).  If the employer shows that his failure to pay his employees "was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216." 29 U.S.C. § 260.

"The granting of liquidated damages is mandatory under section 216(b) except where the employer shows to the satisfaction of the court that its act or omission was in 'good faith' and was based upon reasonable grounds for believing that it was not violating the Act." *Lowe v. Southmark Corp.*, 998 F.2d 335, 337 (5th Cir. 1993).  A court has discretion to deny liquidated damages—or award less than an amount equal to back pay—only when the employer makes the showing required by § 260.  *Id.*; *see also Lee v. Cohoma Cnty.*, 937 F.2d 220, 227 (5th Cir. 1991) ("even if the district

25

court determines that the employer's actions were in good faith and based on reasonable grounds, the court has discretion to award liquidated damages").   The employer has a "substantial burden" to show good faith and reasonableness.  *Singer v. City of Waco*, 324 F.3d 813, 823 (5th Cir. 2003); *Bernard v. IBP, Inc. of Neb.*, 154 F.3d 259, 267 (5th Cir. 1998); *Mireles v. Frio Foods, Inc.*, 899 F.2d 1407, 1415 (5th Cir. 1990).   "The dual and specific findings of good faith and reasonable grounds have been interpreted strictly by [the Fifth Circuit]."  *Lee*, 937 F.2d at 227.

The record does not show that Dow has met this burden with respect to Nugent's claims. Although training was not an independent requirement, it would not be reasonable for Dow to expect that most employees could advance two skill levels per year in diverse subject areas without studying in some way.  And Dow was well aware that the operators in Freeport were spending time in training as part of the FSP.  Dow had records showing that Nugent was putting in hours training at Brazosport College.   There is no evidence that Dow consulted with counsel or the DOL to determine whether these hours were compensable.  As Dow states in its briefing, it paid employees for required training outside the FSP.  The reasonable position, absent some legal opinion to the contrary, would have been to do the same for at least some amount of FSP-related training.

As to Maynor, Dow had no records of his training time.  When Dow reached a settlement with the DOL, Maynor did not receive any payment for this reason.  It was reasonable, as discussed above, for Dow to require that Maynor release his hours to the company through a FERPA release form rather than by submitting a paper copy of a transcript.  The record also shows that Dow's actions were in good faith.  Dow repeatedly encouraged Maynor to sign a release form and explained the reasons why this was necessary.

When the employer has shown good faith and reasonableness, awarding liquidated damages is within the court's discretion.  *Lee*, 937 F.2d at 227.  Because the FSP as a whole unreasonably

denied payment to employees, Maynor's decision to violate the rule requiring a release form does not overcome the compensatory purpose of Maynor's liquidated damages. *See Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 706, 65 S. Ct. 895 (1945) (stating that FLSA liquidated damages are compensatory); *Laffey v. Northwest Airlines, Inc.*, 740 F.2d 1071, 1096 (D.C. Cir. 1984) (stating that the *Brooklyn Savings Bank* description still applied even though liquidated damages had been made discretionary in 1947). The motion for liquidated damages on the pay claims is granted. Maynor and Nugent are both entitled to liquidated damages equal to their back pay awards.

## V.      Conclusion

Dow's motion for judgment as a matter of law is granted. Dow's motions for relief on alternative grounds are moot. Maynor's motion for reinstatement or front pay is denied. Maynor's motions for entry of judgment, attorney's fees, front pay, reinstatement, and liquidated damages on the retaliation claim are denied because he has not prevailed on that claim. The plaintiffs' motions for entry of judgment for back pay and $25,000 in attorneys' fees on the pay claims are granted without opposition. The plaintiffs' motion for liquidated damages on the pay claims is granted. The parties are ordered to confer and submit a proposed final judgment by **July 26, 2010.**

SIGNED on July 19, 2010, at Houston, Texas.

*Lee H. Rosenthal*
_____
Lee H. Rosenthal
United States District Judge

27